

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00283-CR

———————————————————

CHARLES BITTICK, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1601392D

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Opinion by Chief Justice Sudderth

## OPINION

Appellant Charles Bittick appeals his convictions for aggravated assault with a deadly weapon and engaging in organized criminal activity by committing aggravated assault as a member of a criminal street gang. *See* Tex. Penal Code Ann. §§ 22.02(a)(2), 71.02(a)(1). He raises seven appellate issues ranging from the sufficiency of the evidence to Double Jeopardy to the dismissal of jurors. While most of these can be resolved based on settled law, one of Bittick's appellate issues presents two matters of first impression: (1) whether the "individual participation in crime" requirement—recognized in *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021), to be a component of "member[ship in] a criminal street gang" for purposes of unlawful carrying—extends to the offense of engaging in organized criminal activity; and (2) if so, whether that requirement is satisfied by the predicate crime underlying the offense of engaging in organized criminal activity. Because we answer yes to both questions, and because none of Bittick's other appellate issues identify a preserved, harmful error, we will affirm the trial court's judgments.

## I. Background

Bittick and several other individuals beat up a man—David Perez—at a 7-Eleven. The assault of Perez was captured on surveillance video.

## A. The Assault

In the video, a four-door truck can be seen parked on the left of Perez's car, and Bittick—wearing a green plaid shirt—exited the passenger side of the truck.

2

According to Perez, when Bittick exited the truck, the truck door dinged Perez's car. And the surveillance video shows that after Perez exited his car, he said something to Bittick, and at that point, Bittick punched him in the face.

After that initial punch, Perez ran into the parking lot of the gas station, and as he did, two other men—both wearing black shirts with green lettering—got out of the truck while a third man—also wearing a black shirt with green lettering—came from the 7-Eleven store and joined them. The group approached Perez in a looming manner, and ultimately, one of the men in Bittick's group chased Perez to the far side of the parking lot and wrestled him to the concrete. Bittick ran to join them and proceeded to kick and punch Perez repeatedly. Bittick and his group then returned to their truck and drove away while Perez made his way into the 7-Eleven store.[1]

Once inside the store, Perez called for help. His wife, his sister-in-law, paramedics, and the police all joined him at the 7-Eleven. Later, another man in a black shirt arrived at the 7-Eleven on a motorcycle. He entered the store, purchased a few items, and left.

The State alleged that Bittick and the men with him at the 7-Eleven—including the man on the motorcycle who came to the 7-Eleven after the incident—were members of a motorcycle gang known as the Vagos. Bittick was indicted for

---

[1]The entire episode—from Bittick opening his truck door to the truck pulling away—spanned about two minutes.

3

(1) aggravated assault with a deadly weapon—"hands or feet or a hard surface" and (2) engaging in organized criminal activity by committing aggravated assault as a member of a criminal street gang. *See* Tex. Penal Code Ann. §§ 22.02(a)(2), 71.02(a)(1).

## B.    Trial Issues

This appeal centers not so much on the assault as on the complications that arose during trial, including (1) the objections to and admissibility of expert testimony from the State's officer–witnesses and (2) the potential disability of two jurors.

### 1.    Officers' Testimony

To prove that the Vagos group was "a criminal street gang" under the Penal Code, the State intended to call two police officers as gang experts:  Chris McAnulty and Oswaldo Preciado.[2]  But because the State had failed to give timely notice of any expert testimony in violation of Article 39.14 of the Code of Criminal Procedure, Bittick sought to exclude the officers' expert testimony.

#### a.    Motion in Limine

At the beginning of trial, Bittick moved for a limine order based on Article 39.14, arguing that the State should not be permitted to refer to the Vagos as "a

---

[2]Although the State's tardy notice of expert witnesses designated eleven experts—including other police officers—the State told the trial court that, in reality, McAnulty and Preciado were the only two individuals from whom it intended to elicit expert testimony.

4

criminal street gang" in its opening statement because "if the law [wa]s followed, [the State was] not going to be allowed to call any experts" to prove that the Vagos group was in fact a criminal street gang. When the trial court asked the State how— "assuming that [Bittick] [wa]s right"—it intended to prove the criminal-street-gang element of the indictment, the State responded that it would be offering lay testimony from other officers—S. Womack and Caleb Ferren—who had personal knowledge of "document[ing] these guys as . . . members of the Vagos." Ultimately, the trial court ruled that the State could refer to the Vagos as a criminal street gang in its opening statement. When Bittick protested the ruling, the trial court asked if he was "making a motion in limine as to the[ State's] experts too." Bittick confirmed as much, and the trial court granted the motion "as to experts" but it "allow[ed] [the State] to talk about criminal street gang and whether or not he was a member." Bittick requested "a running objection regarding that motion in limine," and the trial court granted the running objection "as to whether the Vagos is a criminal street gang."

### b. Article 39.14 Objection

The trial court then proceeded to hear Bittick's "39.14 objection to the experts," and the parties presented arguments regarding whether Bittick was surprised by the tardy witness designations and whether the State's untimeliness was in bad faith. After hearing the arguments, the trial court stated that it "ha[d not] made up [its] mind as to whether or not the[] experts are going to testify" and would "take this under advisement." Because the trial court was "still going to grant the motion in

5

limine" as to the expert testimony, though, the State sought clarification "about what [it was] allowed to get into [in] opening," and the trial court reiterated that it "c[ould not] talk about any expert testimony" but that it was "allowed to say that the Vagos are an outlaw motorcycle gang." The State had intended to call one of its experts—Preciado—as its first witness, but because the trial court was taking the Article 39.14 objection under advisement, the trial court indicated that Preciado could not testify yet, and the State reordered its witnesses.

### c.    Objections

The State thus began its law-enforcement testimony with the two officers it had intended to call as lay witnesses: Womack and Ferren. When Womack began to discuss the gang database, Bittick asked to approach the bench, and upon approaching, he objected that the State was "about to start eliciting expert testimony." The State maintained that it was "not proffering [Womack] as an expert," so Bittick broadened his objection to Womack providing "any expert testimony regarding anything." The trial court responded that Bittick "already ha[d his] objection," and the testimony resumed without a ruling. Although Bittick continued to object periodically to questions that he believed called for Womack to give expert testimony, at no point did Bittick obtain a running objection to the scope of Womack's testimony.

Nor, when Ferren later took the stand, did Bittick obtain a running objection to the scope of Ferren's testimony. Instead, as he had done with Womack, Bittick

6

objected to specific questions that he believed called for expert testimony—implicitly recognizing that he had no running objection on the issue.

Finally, the State proceeded to the two officers it had intended to introduce as experts. McAnulty started by testifying as a lay witness, but midway through his testimony, Bittick asked for a hearing outside the jury's presence, and the trial court revisited the Article 39.14 objection it had taken under advisement. It found that McAnulty could not testify as an expert, and it sustained Bittick's objection to McAnulty's giving of "any history lesson . . . about the history of gangs in general." When the jury returned, the trial court instructed the jury to disregard any of McAnulty's prior testimony "as to any facts about motorcycle gangs in general, as well as any historical facts about the Vagos Motorcycle Gang, its origination, and its growth." Bittick did not request an instruction to disregard any other portions of McAnulty's prior testimony.

McAnulty then resumed testifying as a lay witness, and Bittick objected periodically when he believed McAnulty had crossed into a topic of expert testimony.[3] As with Womack and Ferren, Bittick did not obtain a running objection to the scope of McAnulty's testimony.

---

[3]Bittick objected to McAnulty's testimony regarding the Vagos' association with other gangs, how a Vagos member "c[a]me out" publicly, and when the Fort Worth chapter of the Vagos was chartered, among other things.

Given the trial court's exclusion of McAnulty's expert testimony under Article 39.14, the State called Preciado only as a lay witness, and after a voir dire examination outside the jury's presence, the trial court limited Preciado's testimony to a few specific topics that it did not consider to be expert testimony. Bittick requested a running objection to the scope of Preciado's testimony, but the trial court denied it and told Bittick that, apart from the specific topics identified, if Preciado exceeded the scope of his personal knowledge, Bittick needed to object on that basis.

### d.     Unobjected-to Testimony

The parties dispute whether the four police officers' testimony crossed into the expert realm. But even setting aside testimony that Bittick objected to on this basis, the officers provided quite a bit of unobjected-to testimony related to the Vagos street gang and its history, customs, and culture.

In addition to testifying that Bittick had self-identified to him as a Vagos member, Womack described how he had encountered Bittick at a "biker shop store . . . frequented by . . . outlaw motorcycle gang members" while Womack was policing a 2018 Stockyards motorcycle rally hosted by another motorcycle group—the Mongols. Ferren, too, had policed the 2018 Stockyards rally. He explained that the rally was the first time Fort Worth's gang enforcement unit became aware of the

Vagos' presence in Texas[4] and that, like the Mongols, the Vagos had come to Texas from California. He estimated that, during the rally, the police had documented 178 individuals as members of various gangs.

McAnulty, who also policed the 2018 Stockyards rally, testified that three individuals wearing "Vagos prospect cut[s]" had been arrested there for weapons-related offenses—two of which McAnulty had observed personally. He stated that the weapons-related offenses were not surprising because "outlaw motorcycle gang members . . . are known to carry weapons" and prospects in particular are often "put on security duties."

Womack, Ferren, and McAnulty explained the meaning of the word "prospect," as well as the meaning of other gang-related terms. McAnulty further explained that individuals in the "prospecting phase" (i.e., "prospects") wore "prospect cut[s]," while those who had completed the phase wore a "full patch set"— they had more patches on the back of their "cuts." Womack and Ferren clarified that a motorcycle "cut" refers to a "vest [made] out of leather and denim that has . . . the club's patches identifying the club."

The officers used photographs of the cuts that Bittick and his group wore at the 2018 Stockyards rally to demonstrate the different cut components. Womack

---

[4]Womack testified similarly, but Bittick objected to that testimony as crossing into the expert realm.

9

explained that the "Green Nation" patch on Bittick's cut refers to "the colors of the club," that "the back of his cut . . . identifie[s] the Vagos[,] and [that] the bottom rocker [of his cut] . . . signifies the state that he is from"—California. Ferren clarified where a "rocker" was on a cut, and he confirmed that the "top rocker" on a cut generally identifies the name of the motorcycle club and the bottom rocker generally shows the territory that the gang member claims.

Ferren interpreted the patches shown on photographs of a cut worn by another Vagos member; he explained, for example, what an "LVDV" patch means ("Live Vagos, die Vagos"); that "Loki's head" patches reflect the Vagos logo; and that "We give what we get" is a Vagos motto. He also identified which patches are "earned" for "violent encounter[s]" with other gangs or with random citizens.

The photographed Vagos cuts bore "one-percenter" patches as well, and Ferren and McAnulty explained that such patches are a statement that a person is among "the 1 percent of motorcycle riders who don't care about societal norms" or the "rules of the land" and are "going to live their life how they want no matter what the consequences are or what society thinks about it."[5] McAnulty confirmed that the

---

[5]Ferren gave the historical background for the one-percent patches:

So the 1 percent diamonds . . . date[] all the way back to 1947 in Hollister, California, where a postwar motorcycle event got out of control . . . . Afterwards, . . . the American Motorcyclist Association came out and tried to salvage the public image . . . and basically said that they didn't want . . . the event to sully the view of all motorcyclists, that

Vagos group is "a one-percenter gang" and that "they sport the one-percenter patch on their cuts."

Womack explained that the photographed Vagos cuts were taken as part of documenting the wearers as gang members, and Womack confirmed that he had documented Bittick as a gang member. He told the jury that Texas uses a gang database to track documented gang members, and he listed several criteria the police use to determine whether a person qualifies to be documented and entered in the database. Womack and McAnulty explained that the Fort Worth Police Department was statutorily required to maintain the gang database, and McAnulty confirmed that doing so was part of a gang intelligence officer's job duties. Womack confirmed that, in 2018, he had documented not only Bittick but also several other members of the Vagos gang.

Womack and McAnulty recognized two documented Vagos members (in addition to Bittick) among the men who emerged from Bittick's truck in the 7-Eleven surveillance video. Womack told the jury that the green and black apparel worn by Bittick's group on the night of the assault was consistent with the Vagos' colors.

---

99 percent of all motorcyclists are good, law-abiding, and decent citizens. And so at that point, the . . . groups that claimed gang status or outlaw status started wearing 1 percent to say, "Well, if 99 percent of the motorcyclists in this country are good and decent and law-abiding citizens, we are the 1 percent."

11

Notably, Womack, Ferren, and McAnulty all identified the motorcyclist who came into the 7-Eleven store after the assault as another Vagos member named Christopher Vick. Ferren confirmed that, in his experience, it was not uncommon for a gang member to return to the scene of a gang crime to determine whether there were witnesses and whether a police report had been filed.

Ferren had interacted with Vick back in 2018, and he authenticated photographs of Vick wearing "a Vagos cut." He noted that the bottom rocker of Vick's cut indicated that Vick was a "nomad"—meaning that he was one of a group of high-ranking, "handpicked individuals who had proven themselves" within the Vagos gang and who would be sent to start a new chapter in an area.

Another Vagos member made an appearance in the case as well. During trial, while Perez was testifying, the State pointed out a man in the courtroom gallery. McAnulty later identified the man as Daniel Rose, and he authenticated photographs of Rose "wearing a Vagos cut and throwing up a hand sign in the shape of a V."

None of the above was objected to as beyond the scope of lay witness testimony.

### 2. Juror Complications

The debate over the officers' testimony was not the only trial complication. During the State's case-in-chief, two juror issues arose.

The first occurred after the State pointed out Rose's presence in the courtroom gallery, and a member of the jury—Juror 12—informed the bailiff that she felt

12

intimidated. The trial court spoke with the juror about her fear, and she explained that she "had had a prior experience as a juror where [she] was followed by the defendant, and it just was very scary," so "when it was pointed out that there were additional people in the [court]room [watching Perez's testimony], [she] just kind of had this sense of fear." But when asked by the trial court about her ability to continue serving on the jury, Juror 12 confirmed that "this episode [was not] going to have any effect on [her] as a juror" and that she was still going to abide by her oath to render "a true verdict . . . based solely on the law and the evidence." She remained on the jury.

Later, a different juror—Juror 20—informed the bailiff that he recognized one of the individuals shown in a Vagos photograph that had been admitted into evidence. Upon questioning, Juror 20 indicated that he had known the individual for "about 10 or 12 years," that they were both part of a group that "used to hang out every weekend," and that he had not known the individual to have been part of a motorcycle gang. He admitted that, because "[he] consider[ed the man] a friend, . . . [he] would kind of be more biased towards and lean that way." Asked if he could put aside "that [he] personally kn[e]w somebody who ha[d] been introduced as potential evidence in this case" and still "evaluate the evidence only as it relate[d] to this defendant [i.e., Bittick]," Juror 20 responded that he could not, "no, sir," because "as [he] was trying to make a decision, that would still be in [his] head." He told the trial court it was "fair" to say he could not abide by his juror oath. Juror 20 was dismissed and replaced with an alternate juror.

13

## C.  Verdict

The jury convicted Bittick of both aggravated assault and engaging in organized criminal activity in the commission of aggravated assault. *See* Tex. Penal Code Ann. §§ 22.02(a)(2), 71.02(a)(1).  After hearing additional punishment evidence irrelevant to this appeal, the jury returned a verdict of ten years' probation for the aggravated assault and five years' confinement for engaging in organized criminal activity.  The trial court entered judgments on the verdict.

## II.  Discussion

Bittick raises seven issues which we reorder and construe as five:   (1) the sufficiency of the evidence to prove his "individual participation in crime"—an argument that presents matters of first impression; (2) the trial court's failure to treat aggravated assault as a lesser-included offense of engaging in organized criminal activity in the jury charge and the corresponding Double Jeopardy violation; (3) the trial court's admission of allegedly irrelevant evidence regarding another criminal street gang; (4) the trial court's admission of expert testimony from the four police officers; and (5) the trial court's failure to dismiss Juror 12 and its decision to dismiss Juror 20.

## A.  Sufficiency of the Evidence

Bittick first contends that there was insufficient evidence showing him to be a "member of a criminal street gang"—an essential element of engaging in organized criminal activity—because the State offered no evidence of Bittick's "individual

14

participation in crime." He contends that *Martin* requires evidence of a person's "individual participation in crime" to prove that the person is "a member of a criminal street gang." *Martin*, 635 S.W.3d at 679. And because there was no evidence that he had any criminal history, Bittick reasons that the State failed to carry its burden.

The State does not appear to dispute *Martin*'s applicability, nor does it dispute the lack of evidence regarding Bittick's criminal history. But it argues that Bittick's aggravated assault against Perez was itself the "individual participation in crime" required to cement his qualification as a "member of a criminal street gang." *See id.*

This issue presents two matters of first impression: (1) whether *Martin*'s "individual participation in crime" requirement extends to the offense of engaging in organized criminal activity and (2) if so, whether this requirement is satisfied by evidence of the crime that underlies the offense of engaging in organized criminal activity.

1.    **Standard of Review**

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018).

Here, because the sufficiency of the evidence turns on not only the evidence but also the meaning of the statute, we must perform a de novo statutory analysis to

15

determine the elements of the offense before reviewing the evidence presented. *See Martin*, 635 S.W.3d at 677.

## 2. Elements of Engaging in Organized Criminal Activity

Generally, "[a] person commits [the] offense [of engaging in organized criminal activity] if, . . . as a member of a criminal street gang, the person commits or conspires to commit . . . aggravated assault."[6] Tex. Penal Code Ann. § 71.02(a)(1); *see Zuniga*, 551 S.W.3d at 735 (identifying statutory elements based on statute's grammatical structure). One of the crime's essential elements, then, is that the person acts "as a member of a criminal street gang." *Zuniga*, 551 S.W.3d at 735–36.

A "criminal street gang" is statutorily defined as "three or more persons [(1)] having a common identifying sign or symbol or an identifiable leadership[7] [and (2)] who continuously or regularly associate in the commission of criminal activities." Tex. Penal Code Ann. § 71.01(d). The Penal Code does not specify who qualifies as a "member," but the Court of Criminal Appeals addressed the issue in the context of

---

[6]Because the crime's essential elements are those which would appear in the hypothetically correct jury charge, and because such a jury charge would reflect the elements as modified by the indictment, our recitation of the elements reflects the modifications in Bittick's indictment. *Zuniga*, 551 S.W.3d at 733–34.

[7]Bittick does not challenge the sufficiency of the evidence to prove that the Vagos group satisfies at least one of these three disjunctive requirements, i.e., that it has "a common identifying sign," "a common identifying . . . symbol[,]" or an identifiable leadership." Tex. Penal Code Ann. § 71.01(d); *see Ex parte Flores*, 483 S.W.3d 632, 644 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (clarifying construction).

another gang-related offense:  unlawful carrying of a weapon.  *See Martin*, 635 S.W.3d at 677–79.

### a.  *Martin*'s "Individual Participation" Requirement

In *Martin*, the defendant (Martin) was convicted of unlawful carrying of a weapon by "a member of a criminal street gang."  *Id.* at 673 n.1, 675–77, 679 (quoting former Tex. Penal Code Ann. § 46.02(a-1)(2)(C) and noting recodification as Tex. Penal Code Ann. § 46.04(a-1)).  While Martin admitted that he was a member of the relevant group from a factual perspective, he argued that he was not legally a "member of a criminal street gang" because there was no evidence that he personally had "continuously or regularly associate[d] in the commission of criminal activities." *Id.* at 675–76.  According to Martin, being a "member" of a criminal street gang required more than mere association with a questionable group of people.  *Id.* at 676, 678–79.  The Court of Criminal Appeals agreed.

It rejected the idea that carrying a weapon—generally a lawful activity—could become a criminal activity based solely on a defendant's affiliation with a group that— possibly without the defendant's knowledge—was involved in the commission of other criminal activities.  *Id.* at 677–79 (noting that "where otherwise[-]innocent behavior becomes criminal because of the circumstances under which it is done, a culpable mental state is required as to those surrounding circumstances").  Such a statute would be unconstitutional, the Court noted, and the legislature could not have intended that result.  *Id.* at 678–79.  Rather, the legislature must have intended for the

terms "member" and "criminal street gang" to be read together such that proving membership requires "individual participation in crime." *Id.* at 677–79. The Court thus held that, in the context of unlawful carrying, "to be a member of a criminal street gang, the actor must be one of three or more persons with a common identifying sign, symbol, or identifiable leadership *and must also* continuously or regularly associate in the commission of criminal activities." *Id.* at 679 (emphasis in original, quotation marks omitted).

### b. *Martin*'s Applicability

Bittick argues that *Martin*'s "individual participation" requirement should be extended to the offense of engaging in organized criminal activity. *See id.* at 677–79. He argues that, to prove he was acting as "a member of a criminal street gang," the State was required to prove his "individual participation in crime." *Id.* at 679. We agree.

"[T]here is a presumption of statutory consistency." *Ex parte Keller*, 173 S.W.3d 492, 498 (Tex. Crim. App. 2005); *Coleman v. State*, 359 S.W.3d 749, 752–53 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Keller*); *cf.* Tex. Penal Code Ann. § 1.07(b) (codifying a form of consistency by providing that "[t]he definition of a term in this code applies to each grammatical variation of the term"). Absent a clear indication of legislative intent to the contrary, "the normal rule of statutory construction" dictates that "identical words used in different parts of the same act [or statute] are intended to have the same meaning." *Keller*, 173 S.W.3d at 498 (quoting

18

*Gustafson v. Alloyd Co.*, 513 U.S. 561, 570, 115 S. Ct. 1061, 1067 (1995), and noting further that "a word or phrase that is used within a single statute generally bears the same meaning throughout that statute").

The term used in the unlawful carrying statute and construed in *Martin*—"a member of a criminal street gang"—is identical to the term used in the statute that criminalizes engaging in organized criminal activity. *Compare Martin*, 635 S.W.3d at 676–77 (quoting former Tex. Penal Code Ann. § 46.02(a-1)(2)(C)), *and* Tex. Penal Code Ann. § 46.04(a-1), *with* Tex. Penal Code Ann. § 71.02(a)(1). And both Penal Code provisions incorporate the same statutory definition of "criminal street gang" from which "the term 'member' . . . derives its content." *Flores*, 483 S.W.3d at 645; *see* Tex. Penal Code Ann. § 46.04(a-1) (referencing definition in Section 71.01), § 71.01 (providing definition for "this chapter," i.e., Chapter 71), § 71.02 (defining the offense of engaging in organized criminal activity within Chapter 71). As *Martin* explained, the "individual participation" requirement is a result of "reading the terms 'member' and 'criminal street gang' *together as opposed to separately,*" which is a foundational canon of construction for all Penal Code statutes—not just the provision defining unlawful carrying of a weapon. *Martin*, 635 S.W.3d at 678 (emphasis in original) (discussing *Flores*, 483 S.W.3d at 645, with approval and agreeing with its interpretation).

There is no indication that the legislature intended for the term "member of a criminal street gang" in the unlawful carrying provision of the Penal Code to mean something different than the same term—"member of a criminal street gang"—in the

19

engaging in organized criminal activity provision of the Penal Code. *See Keller*, 173 S.W.3d at 498 (holding that "the term 'previously convicted' in § 508.149(a) [of the Penal Code] is the same when it is used to describe those who are ineligible for release on mandatory supervision as when it is used to describe those who are ineligible for 'street time' credit under § 508.283(c)"). Thus, presuming statutory consistency, *see id.*, *Martin*'s binding interpretation of this phrase extends to the phrase's use in the Penal Code provision at issue.

We hold that, to prove the offense of engaging in organized criminal activity, the State was required to show Bittick's "individual participation in crime." *Martin*, 635 S.W.3d at 679.

### 3. Evidence of "Individual Participation"

The State contends that it satisfied *Martin*'s "individual participation" requirement by virtue of proving that Bittick committed the aggravated assault (of Perez) underlying his organized criminal activity charge. We agree.

Because the offense at issue in *Martin*—unlawful carrying—criminalized otherwise-legal activity based solely on a person's "membership in a criminal street gang," the defendant's "individual participation" was required to be established through evidence of other crimes. *See id.* at 680 (holding evidence insufficient because there was no evidence that Martin was aware of or involved in gang's criminal activities). But while the offense of engaging in organized criminal activity does not criminalize otherwise-lawful activity, the underlying activity here—the aggravated

20

assault—is already unlawful. *See* Tex. Penal Code Ann. § 71.02(a)(1) (listing predicate crimes for engaging in organized criminal activity). The offense of engaging in organized criminal activity merely enhanced the severity of an already-unlawful act based on Bittick's commission of it in his capacity as "a member of a criminal street gang."[8] *See id.* § 71.02(a); *Zuniga*, 551 S.W.3d at 739 (clarifying that "the statute merely requires proof that the defendant . . . was acting pursuant to his role or capacity as a gang member" meaning that the evidence "show[s] some nexus or relationship between the commission of the underlying offense and the defendant's gang membership"). So when the State proved that Bittick committed the underlying predicate crime, it simultaneously proved his "individual participation in crime." *See Martin*, 635 S.W.3d at 679.

Bittick concedes the sufficiency of the evidence to support his predicate crime of aggravated assault. *See* Tex. Penal Code Ann. § 22.02(a)(2). This concession disposes of his sufficiency challenge because his predicate crime was sufficient to satisfy *Martin*'s "individual participation in crime" requirement. *See Martin*, 635 S.W.3d at 679.

Accordingly, we overrule this issue, which Bittick lists as his second.

---

[8]A defendant can even be separately convicted of and punished for the underlying predicate crime, just as Bittick was. *See* Tex. Penal Code Ann. § 71.03(3).

21

**B.     Double Jeopardy and Jury Charge**

Bittick next argues that he was punished twice for the same offense because, under the *Blockburger* analysis, aggravated assault is a lesser-included offense of engaging in organized criminal activity by committing aggravated assault. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932). Because the trial court imposed punishment for both crimes, and because the jury charge listed the two offenses as separate crimes rather than listing the former as a lesser-included offense of the latter, he argues that his Double Jeopardy rights were violated and that the jury charge was erroneous.

But there is binding precedent from the Court of Criminal Appeals that holds to the contrary. Whether or not the *Blockburger* analysis would characterize aggravated assault as a lesser-included offense of engaging in organized criminal activity, "[i]n the multiple punishment context[,] . . . [t]he *Blockburger* test does not operate . . . to trump clearly expressed legislative intent" regarding the scope of punishment. *Garza v. State*, 213 S.W.3d 338, 351–52 (Tex. Crim. App. 2007) (internal quotation marks omitted) (quoting *Ex parte Kopecky*, 821 S.W.2d 957, 959 (Tex. Crim. App. 1992)). And "the Legislature ha[s] clearly indicated its intention that defendants be susceptible to punishment both for organized criminal activity and for any underlying offense they may commit." *Id.* at 352. Consequently, the Court of Criminal Appeals has held that the Double Jeopardy Clause permits separate punishments for both engaging in

22

organized criminal activity and for the underlying predicate crime.[9] *Id.* Following this binding precedent, we hold that Bittick's dual punishments do not violate the Double Jeopardy Clause.

This also resolves Bittick's challenge to the jury charge. Because the legislature authorized punishing a defendant for both organized criminal activity and the underling criminal offense, the trial court did not err by instructing the jury that it could convict Bittick for both offenses—aggravated assault and engaging in organized criminal activity by committing aggravated assault as a member of a criminal street gang. *See id.* (holding similarly when underlying offense was capital murder rather than aggravated assault).

We overrule these two issues, Bittick's third and seventh.

## C. Admission of Evidence on Other Gangs

Bittick next contends that the trial court erred by admitting allegedly irrelevant evidence of a murder committed by another motorcycle gang—the Pagans—with whom the Vagos allegedly associated. But even if this evidence was admitted erroneously, its admission was harmless.

---

[9]Bittick attempts to distinguish his case from *Garza* by arguing that here, unlike *Garza*, there was insufficient evidence that Bittick was a "member of a criminal street gang," so the State only proved one of the two charged offenses. But we have already rejected Bittick's sufficiency argument above. And even if we had not, the alleged insufficiency of the evidence would not change whether, as a matter of law, the legislature authorized separate punishments for engaging in organized criminal activity and for the underlying predicate offense.

23

### 1. Standard of Review

The erroneous admission of evidence is harmful only if it affects the defendant's substantial rights, meaning that "it has a substantial and injurious effect or influence in determin[ing] the jury's verdict." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). In analyzing harm, we consider, among other things, "(1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence supporting the verdict; and (4) whether the State emphasized the error." *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021); *see Gonzalez*, 544 S.W.3d at 373 (similar); *Haley v. State*, 173 S.W.3d 510, 518–19 (Tex. Crim. App. 2005) (listing considerations in harm analysis, including "any testimony or physical evidence . . . , the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, . . . . the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire and whether the State emphasized the error"). "If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction." *Gonzalez*, 544 S.W.3d at 373.

### 2. No Effect on Substantial Rights

At trial, McAnulty testified that he observed members of the Vagos gang at a party hosted by the Pagans and that the party took place not long after a member of

the Pagans had been convicted of "a gang-related murder in Tarrant County."[10] Bittick claims that the Pagans' murder conviction was introduced to show the Vagos' participation in criminal activities—a component of proving that it was a criminal street gang. *See* Tex. Penal Code Ann. §§ 71.01(d), .02(a).

Other than introducing the evidence, however, the State did not emphasize it.[11] *See Gonzalez,* 544 S.W.3d at 373–75 (holding admission of evidence harmless in part because "the State did not emphasize the [challenged] evidence in this case beyond introducing it"). The State's discussion of the Pagans' conviction was limited to approximately three questions from a single witness—less than one page of the several-hundred-page transcript of guilt–innocence testimony. *See id.* (holding admission of evidence harmless and noting that the entirety of the evidence was "elicited in five pages of the State's thirty-two page cross-examination of [the defendant]"). And the State's closing argument made no mention of the Pagans. *See id.* (holding admission of evidence harmless and noting that the State did not

---

[10]Bittick objected to the discussion of the murder in the latter portion of this testimony, but it was admitted over his objection. *See* Tex. R. App. P. 33.1(a).

[11]Bittick contends that, when he moved for a directed verdict regarding his participation in the Vagos' continuous criminal activities, "[t]he State told the court that it had shown evidence of three offences including the Pagan cases." But this is not so. Rather, when Bittick argued that there was no evidence that the Vagos qualified as a criminal street gang, the State responded by pointing to evidence of the Vagos' crimes, and the trial court recalled that there was also evidence of "at least one member of the . . . Pagans that [the Vagos gang] associate[s] with being convicted of murder."

reference it during closing argument). Instead, the State pointed the jury to the evidence of "several weapons-related offense[s] . . . that the Vagos members [had been] arrested for, and then . . . this violent attack against David Perez" as evidence of the Vagos' criminal activities.

It was Bittick's counsel—not the State—who mentioned the Pagans in closing argument. Even then, Bittick's counsel mentioned the Pagans only to clarify that the Vagos and the Pagans were "not the same group" and that "we're not here for Pagans." *See id.* at 373 (noting consideration of "whether the State emphasized the complained of error" as part of harm analysis); *Haley*, 173 S.W.3d at 518–19 (similar, also noting consideration of "the State's theory [of the case] and . . . closing argument[]").

The jury charge reinforced this point; it did not authorize the jury to consider the Pagans member's murder conviction when determining whether Bittick was "a member of a criminal street gang." *See Gonzalez*, 544 S.W.3d at 373 (noting consideration of "how [the evidence] might be considered in connection with other evidence" as part of harm analysis); *Haley*, 173 S.W.3d at 518–19 (noting consideration of "the jury instructions" as part of harm analysis). The charge defined a "criminal street gang" as being limited to "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities," and there was neither evidence nor allegation that the Pagans shared "a common identifying sign or symbol or an identifiable

26

leadership" with the Vagos or with Bittick. In other words, the charge instructions limited the jury to the "criminal activities" committed by the Vagos—not the Pagans. And absent evidence to the contrary—of which none is presented here—we presume that the jury followed the jury charge's instructions and definitions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) ("[W]e generally presume the jury follows the trial court's instructions in the manner presented."); *Elmawla v. State*, No. 02-19-00279-CR, 2021 WL 1421437, at *6 (Tex. App.—Fort Worth Apr. 15, 2021, pet. ref'd) (mem. op., not designated for publication) (similar).

Plus, the challenged evidence was not "so emotionally charged as to prevent the jury from [following the jury charge's instructions and] rationally considering the rest of [the] evidence before it." *See Gonzalez*, 544 S.W.3d at 374 (holding admission of evidence harmless when "it could have distracted the jury from the indicted offense" but "was not the focus of the State's case" and was not "so emotionally charged" to prevent the jury's rational consideration of the evidence). In fact, the less-than-one page of testimony regarding the murder was relatively bare-bones. Although McAnulty confirmed that "one member of the Pagans [had been] convicted of a gang-related murder in Tarrant County," he did not identify the victim, elaborate on the circumstances of the murder, or provide details on the manner of death. The jury did not see graphic photographs of the crime scene or hear heart-wrenching details about the family the victim left behind. Because the testimony regarding the murder was not "emotionally charged," *see id.*, there is no reason to presume that the

27

jury could not rationally consider the rest of the evidence to determine if the Vagos qualified as a criminal street gang.

This is particularly true in light of the Vagos-specific evidence that supported the jury's verdict. Bittick himself concedes that there was evidence of Vagos members being arrested for weapons-related offenses during the 2018 Stockyards rally, and the jury saw surveillance video of Bittick and other Vagos members assaulting Perez at a Fort Worth gas station. *See id.* at 373 (noting consideration of "the nature of the evidence supporting the verdict" and "the existence and degree of additional evidence indicating guilt" as part of harm analysis); *Haley*, 173 S.W.3d at 518–19 (similar).

The record as a whole thus provides "a fair assurance" that the admission of McAnulty's testimony regarding the Pagans "did not influence the jury[] or had but a slight effect." *Macedo*, 629 S.W.3d at 240 (quoting *Gonzalez*, 544 S.W.3d at 373). Because the admission of this evidence was harmless, we overrule this issue, which Bittick lists as his sixth.

## D. Admission of Expert Testimony

Bittick also challenges the trial court's admission of what he claims was expert testimony from the four police officers called by the State. Bittick argues that although the officers purported to testify as lay witnesses, their expert testimony crept in under the guise of lay testimony, and the trial court erred by admitting it. He identifies approximately eight excerpts of testimony which he contends crossed the

28

line into expert testimony.[12]  But four of these are unpreserved and the other four—like the challenged evidence regarding the Pagans—are harmless.

### 1.  Standard of Review

To preserve a complaint for appellate review, a party must timely present its complaint to the trial court and obtain an adverse ruling or, if necessary, object to the refusal to rule.  Tex. R. App. P. 33.1(a); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). Because preservation is a systemic requirement, this court has a duty to independently review preservation because we cannot reverse a trial court's judgment on an unpreserved complaint.  *Dixon*, 595 S.W.3d at 223; *see Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016) (recognizing that "a first-tier appellate court may not reverse a judgment of conviction without first addressing any issue of error preservation . . . . whether [or not] the issue is raised by either of the parties" (emphasis omitted)).

Absent a running objection (or another applicable exception), if a party complains of the admission of evidence, the party must object each time the objectionable evidence is offered.  *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App.

---

[12]To the extent that Bittick also challenges McAnulty's testimony regarding the history of Texas gangs, this testimony was stricken from the record and the jury was instructed to disregard it.  We presume the jury complied with this instruction.  *See Wesbrook v. State*, 29 S.W.3d 103, 116 (Tex. Crim. App. 2000) (plurality op.) (presuming jury complied with instruction to disregard).

2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766–67 (Tex. App.—Fort Worth 2012, no pet.). The failure to do so may render the admission of the objectionable evidence harmless as "overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (plurality op.) (reiterating that "any error in admitting the evidence was harmless in light of other properly admitted evidence proving the same fact").

Even if the party objects each time the objectionable evidence is offered, though, and even if the admission of the evidence is erroneous, the error is harmless if the record as a whole provides "a fair assurance . . . that the error did not influence the jury[] or had but a slight effect." *Macedo*, 629 S.W.3d at 240 (quoting *Gonzalez*, 544 S.W.3d at 373).

## 2. Unpreserved Challenges

Bittick claims that he preserved all of his challenges to the officers' testimony by "object[ing] to the expert witnesses on the record at the beginning of the trial and before each witness testified, and during the testimony of each witness." But the

30

record does not bear this out. To the contrary, Bittick preserved only half of the challenges he raises on appeal.[13]

Bittick did not obtain a pretrial ruling on his Article 39.14 objection, and his motion in limine was limited only to opening statements. Even if it could be construed to have had broader application, a motion in limine does not preserve error anyway. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) (noting that "[a] motion in limine . . . is a preliminary matter and normally preserves nothing for appellate review" and that to preserve the challenge "an objection must be made at the time the subject [of the motion in limine] is raised during trial"); *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007).

As for Bittick's objecting "before each witness testified," the record does not reflect this. Bittick did not object before Womack testified, before Ferren testified, or before McAnulty testified. Only Preciado's testimony was objected to and ruled upon prior to his taking the stand. And while Bittick objected periodically "during the testimony of each witness," his challenges on appeal far exceed his periodic objections at trial.

As to four of the eight excerpts of testimony that Bittick challenges on appeal, he failed to object altogether at trial:

---

[13]The State does not challenge preservation.

31

- He challenges certain instances in which Womack and McAnulty referred to individuals as "gang members," but Bittick did not object to these references as expert testimony.

- He challenges Womack's, Ferren's, and McAnulty's explanations of the terms "cut" and "prospect" and of the symbolism and meaning of gang patches, but he did not object to any of these explanations.

- He challenges Ferren's testimony regarding the Vagos' process for starting its Texas chapter, but he did not object to this testimony.

- He challenges McAnulty's testimony that outlaw motorcycle gangs often carry weapons, but he did not object to this testimony.

Because Bittick failed to preserve his challenges to these four excerpts of testimony, he cannot complain of their admission on appeal. *See* Tex. R. App. P. 33.1(a).

### 3.    Harmless Challenges

The unchallenged officer testimony is fatal to Bittick's four remaining, preserved challenges as well, although for a different reason: because the unobjected-to testimony rendered any error in the admission of the objected-to testimony harmless. *See Gonzalez*, 544 S.W.3d at 373; *Leday*, 983 S.W.2d at 718.

#### a.    Cumulative Testimony

Three of Bittick's preserved challenges to the officers' testimony involve statements which were cumulative of other, unobjected-to testimony:

- He challenges Womack's discussion of maintaining the gang database, but McAnulty offered similar testimony—describing the statutory requirement for the database, the criteria for entry into the database, and how an individual can challenge his presence in the database—without objection.

- He challenges Ferren's references to the Vagos' "friendly" relationship with the Mongols, but this descriptor was implied by other, unobjected-to testimony: Womack testified that the Mongols were "another major one-percenter gang," Ferren testified that both gangs were from California, and both officers confirmed that the Vagos attended the Mongols' 2018 Stockyards rally—which Womack described as a "celebration rally, a party."

- He challenges Womack's statements regarding the Vagos not being on the Fort Worth Police Department's radar prior to 2018, but Ferren offered similar, unobjected-to testimony that the gang unit was not aware of the Vagos prior to 2018, and McAnulty offered unobjected-to testimony that the Fort Worth chapter of the Vagos was chartered in 2018.

Because these three challenged excerpts of testimony were admitted elsewhere in substantially similar form and without objection, any error in their admission was harmless. *See Leday*, 983 S.W.2d at 718.

### b. No Effect on Substantial Rights

Only one of Bittick's eight challenges was both preserved and noncumulative, i.e., his complaint regarding Preciado's testimony. Preciado testified—over objection—that both Bittick and Rose were documented as gang members in California. Bittick challenges the admission of this testimony on appeal. But while this evidence did not come in through any other source, it was overshadowed by more probative evidence and did not have a "substantial [or] injurious effect or influence in determin[ing] the jury's verdict." *Gonzalez*, 544 S.W.3d at 373.

The complained-of testimony constitutes less than three pages of the several-hundred-page guilt–innocence transcript. *See id.* (holding admission of evidence harmless and noting that the entirety of the evidence was "elicited in five pages").

33

Furthermore, Preciado's testimony was limited to the Vagos gang in California. Bittick, of course, was indicted for engaging in organized criminal activity in Texas. Although Bittick's cut reflected that he was from California, the jury saw photographs of Bittick wearing the cut in Texas, it heard testimony that he had self-identified and been documented as a gang member in Texas in 2018, and it saw surveillance video of him joining with other members of the Vagos to assault Perez in Texas in 2019. Preciado's testimony that Bittick was also documented as a gang member in California was of little consequence given the evidence of Bittick's open and self-proclaimed participation in the Vagos gang in Texas. *See id.* (listing considerations in harm analysis including "the character of the alleged error and how it might be considered in connection with other evidence").

The State's closing statement was consistent with this. The State highlighted the Fort Worth officers' testimony, telling the jurors that the officers "[we]re telling you what is happening in Fort Worth, what is happening in Tarrant County" and "[y]ou [i.e., the jurors] get to decide what this means to you as a community." It was the Vagos' actions in Texas—not its actions in California—that the State emphasized. *See id.* (listing "whether the State emphasized the complained of error" as consideration in harm analysis).

Except for his courtroom appearance, Rose played no role in the facts of this case, and Preciado's testimony as to his California gang affiliation added little value to the State's evidence. After Rose was identified as a courtroom spectator, McAnulty

identified him in a photograph "wearing a Vagos cut and throwing up a hand sign in the shape of a V," and the jury was provided with a copy of this photograph as evidence of Rose's Vagos affiliation. Preciado's later testimony that Rose had been formally documented as a Vagos member in California provided only marginally more than the jury had already heard. *See id.* (listing "the character of the alleged error and how it might be considered in connection with other evidence" as consideration in harm analysis).

Taken together, the record as a whole provides "a fair assurance" that the admission of Preciado's testimony regarding documented Vagos members in California "did not influence the jury[] or had but a slight effect." *Macedo*, 629 S.W.3d at 240 (quoting *Gonzalez*, 544 S.W.3d at 373). It did not affect Bittick's substantial rights and was harmless. *See id.*

### 4. Conclusion

Because Bittick's eight challenges to the officers' testimony are either unpreserved or harmless, we overrule this issue (which Bittick lists as his first).

## E. Rulings on Jurors

Finally, Bittick challenges the trial court's failure to dismiss one juror—Juror 12—and its dismissal of another—Juror 20.

### 1. Standard of Review and Governing Law

We review a trial court's determination of a juror's disability for an abuse of discretion. *Scales v. State*, 380 S.W.3d 780, 783–84 (Tex. Crim. App. 2012); *Brooks*, 990

35

S.W.2d at 286. The determination must be upheld if it is within the zone of reasonable disagreement. *Scales*, 380 S.W.3d at 784.

A juror may be excused after the felony trial has begun if the juror "becomes disabled from sitting at any time before the charge of the court is read to the jury." Tex. Code Crim. Proc. Ann. art. 36.29(a). "Disability is not limited to physical disease[] but includes 'any condition that inhibits a juror from fully and fairly performing the functions of a juror,'" whether physical, mental, emotional, or otherwise. *Ricketts v. State*, 89 S.W.3d 312, 318 (Tex. App.—Fort Worth 2002, pet. ref'd) (quoting *Reyes v. State*, 30 S.W.3d 409, 411 (Tex. Crim. App. 2000)); *see Scales*, 380 S.W.3d at 783 (similar, quoting *Valdez v. State*, 952 S.W.2d 622, 624 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd)). While a juror's bias or knowledge of a participant does not necessarily render the juror disabled, it can be disabling if the juror cannot set aside the bias or knowledge and remain fair and impartial. *See Reyes*, 30 S.W.3d at 412; *Jackson v. State*, No. 03-20-00085-CR, 2022 WL 257451, at *4 (Tex. App.—Austin Jan. 28, 2022, pet. ref'd) (mem. op., not designated for publication).

### 2. Juror 12

Bittick first complains of the trial court's failure to dismiss Juror 12—the juror who felt intimidated by Rose's presence in the courtroom. Bittick argues that this intimidation rendered her "disabled." But Juror 12 confirmed that Rose's presence was not "going to have any effect on [her] as a juror" and that she would still abide by her oath to render "a true verdict . . . based solely on the law and the evidence."

Based on this testimony, the trial court could have reasonably concluded that Juror 12's fear did not inhibit her from "fully and fairly performing the functions of a juror." *Scales*, 380 S.W.3d at 783 (quoting *Valdez*, 952 S.W.2d at 624); *see Brooks*, 990 S.W.2d at 286 (affirming juror's retention when juror confirmed that his firearms-related arrest at courthouse entrance on morning of punishment phase would not "in any way impede[ his] ability to be fair to both sides in the trial of the punishment"). The trial court thus did not abuse its discretion by declining to dismiss Juror 12.

### 3. Juror 20

Bittick also challenges the trial court's dismissal of Juror 20—the juror who knew one of the individuals depicted in a Vagos photograph. Unlike Juror 12, though, Juror 20 admitted that he could not abide by his juror oath. *See Reyes*, 30 S.W.3d at 412 (contemplating a juror becoming disabled if the juror's knowledge of the defendant inhibits him from fully and fairly performing the functions of a juror). When asked if he could "put . . . aside" his friendship with the photographed individual and "evaluate the evidence only as it relates to this defendant," he responded in the negative, "no, sir." Because Juror 20 admitted—repeatedly—that his friendship with the Vagos-affiliated individual "inhibited him from 'fully and fairly performing the functions of a juror,'" the trial court did not abuse its discretion by dismissing him. *Scales*, 380 S.W.3d at 783 (quoting *Valdez*, 952 S.W.2d at 624); *Reyes*, 30 S.W.3d at 411–12 (quoting *Griffin v. State*, 486 S.W.2d 948, 951 (Tex. Crim. App. 1972)); *see Jackson*, 2022 WL 257451, at *3–4 (holding trial court did not abuse

37

discretion by dismissing juror who recognized non-witness involved in the case and who stated that she "could [not] be fair to the defendant" due to her relationship with the individual).

We overrule Bittick's two juror-related issues, his fourth and fifth.

### III. Conclusion

Having overruled all of Bittick's appellate issues, we affirm the trial court's judgments of conviction. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Publish
Tex. R. App. P. 47.2(b), 47.4(a)

Delivered: November 16, 2023